**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 3:14-CR-1 (CAR)** |
| **DEMETRIUS JACKSON,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER ON MOTIONS TO SUPPRESS

Presently before the Court is Demetrius Jackson's (Defendant) request for an evidentiary hearing, and two particularized Motions to Suppress. Defendant asks this Court to suppress all evidence of and the fruits thereof, including alleged physical evidence, statements, identification, and testimony. Defendant contends law enforcement agents illegally seized this evidence in violation of his First, Fourth, Fifth, Sixth or Fourteenth Amendment rights according to 18 U.S.C. § 2234, 18 U.S.C. § 2510, *et seq.*, during and subsequent to 1) illegal wiretaps of Defendant's telephone communications, and 2) an illegal search of Defendant's residence and seizure of items therein.

In Defendant's first Motion to Suppress [Doc. 236], he asks this Court for an evidentiary hearing and to suppress evidence obtained as a result of two wiretap orders. In his second Motion to Suppress [Doc. 237], Defendant seeks to suppress any

1

evidence obtained under a search warrant of his residence. The Government opposes both Motions, and for the reasons set forth herein, Defendant's request for an evidentiary hearing, and Motions to Suppress [Doc. 236 & 237] are **DENIED**.[1]

## BACKGROUND

### A.  Facts Relating to Wiretap Orders

#### 1.  May 6, 2013 Wiretap Order

On May 6, 2013, upon an application and a 90-page affidavit by DEA Special Agent Hubert F. Jordan, this Court entered an order authorizing the interception of wire communications for Target Telephone 1 (TT1), a telephone purportedly used by Tiant Quimby. Quimby was identified in the affidavit as "the leader of the cocaine and crack cocaine trafficking organization." In the affidavit, the Government provided extensive background regarding the investigation of drug trafficking activities, and the Court found that there was probable cause to issue the requested wiretap.

Beginning in August 2012, the Northeast Georgia Regional Drug Task Force ("NEGRDTF") began investigating a suspected drug trafficking organization run by Quimby and others. In August 2012, a confidential source (CS1) working for NEGRDTF identified Michael Grant (Grant) as a large scale cocaine and crack cocaine dealer in the Athens, Georgia area. Grant was believed to be supplied by persons located in the

---

[1] The Court analyzes the Motions to Suppress together because Defendant argues that they are interdependent in his Motions.

Atlanta, Georgia metro area. Grant had already been identified by law enforcement as working with Quimby to distribute cocaine and crack cocaine in the Athens, Georgia.

Between August 23, 2012, and January 17, 2013, CS1 conducted a total of six controlled buys under the supervision of law enforcement for crack cocaine, marijuana, and/or firearms from Grant in Athens. Four of the buys involved crack cocaine, two involved marijuana, and two involved firearms. On August 23, 2012, CS1 met Grant at Grant's mother's residence in Athens, Georgia, to conduct a drug deal. The two individuals then went to a second location, and CS1 bought a quarter ounce of marijuana for $90 and a .22 caliber Derringer handgun from Grant. CS1 did not pay Grant for the firearm at this time. This transaction was recorded by video and audio. On November 1, 2012, CS1 again met with Grant at Grant's mother's house to conduct a drug deal. Quimby was also present at this location. CS1 and Grant again went to a second location where CS1 purchased half an ounce of marijuana for $150 and a 9mm handgun for $100. Quimby did not join CS1 and Grant at the second location. This transaction was recorded by audio and video. On November 12, 2012, CS1 went to Grant's mother's residence yet again. CS1 paid Grant $100 for the .22 caliber Derringer CS1 had previously bought from Grant. This transaction was recorded via audio and video. Plans were in place for CS1 to attempt another crack cocaine buy with Grant on February 15, 2013. However, Grant was arrested before the controlled buy could occur.

Grant was found with one ounce of crack cocaine on his person. Grant's arrest was not made in conjunction with the current investigation.

Prior to Grant's arrest, another confidential source (CS2) conducted approximately three controlled crack cocaine buys with Willie Hill (Hill). These buys occurred on January 16, January 25, and February 14, 2013. During the controlled buy of crack cocaine on January 25, 2013, Hill was seen traveling to meet Grant to obtain the crack cocaine meant for CS2. All three of these transactions were facilitated through Hill's cellular telephone number, which CS2 provided to law enforcement. Upon analysis, toll records show that Hill had been in contact with Quimby through TT1.

During the middle of February 2013, CS1 informed law enforcement that he/she had been in contact with Quimby through TT1. CS1 told law enforcement that Quimby called CS1 to ask CS1 how much Quimby should charge for some prescription pills that Quimby had acquired. CS1 and Quimby used to sell illegally obtained prescription pills in the Athens, Georgia, area. These past dealings enabled CS1 to provide law enforcement with Quimby's telephone number (TT1). CS1 also informed agents that Quimby had stopped supplying Grant with cocaine a few days prior to his arrest because Grant had been acting recklessly. This call was not recorded because CS1 did not have a recorder at the time.

Since CS1's call with Quimby regarding the prescription pills and Grant's recklessness, CS1 had been in contact with Quimby and conducted two controlled buys

of crack cocaine through Quimby and "Poppa," later identified as Antwan Freeman

("A. Freeman"). On February 20, 2013, CS1 spoke with Quimby on TT1 to arrange a

drug deal. On February 26, 2013, CS1 again spoke with Quimby on TT1 about

purchasing crack cocaine the following day. Quimby agreed to contact CS1 the

following day, and indeed, Quimby contacted CS1 on February 27, 2013, for that

purpose. Though CS1 requested two ounces of crack cocaine, Quimby was only able to

supply CS1 with 48 grams of crack cocaine that day. Quimby told CS1 to meet his

"folks" at James Hill's cell phone store in the Gateway shopping center located at 401

North Avenue in Athens, Georgia. On his way, Quimby conducted a three way call

with CS1, A. Freeman, and himself. This conversation was recorded, but Quimby and

A. Freeman's conversation was unintelligible. This three-way call was later verified

using toll records. Upon CS1's arrival, A. Freeman exited a blue, Nissan Altima and got

into the passenger seat of CS1's vehicle. CS1 paid A. Freeman $1,400 for 48 grams of

crack cocaine. This drug transaction was recorded via a body-worn transmitter. CS1

called Quimby on TT1 later that day to thank him. Quimby commented on the good

quality of the crack cocaine, and Quimby asked CS1 to give Quimby some advanced

notice whenever CS1 needs to buy crack cocaine in the future. This call was recorded.

　　　On March 5, 2013, CS1 spoke with Quimby on TT1 in preparation for a pending

drug transaction with Quimby. Quimby agreed to a transaction, but Quimby told CS1

that Quimby would have to get more crack cocaine first. Quimby and CS1 spoke again

on March 27, 2013. CS1 could not answer Quimby's call at first for lack of a recording device. However, CS1 called Quimby back on TT1, and the two individuals discussed a crack cocaine buy. Quimby stated that he had not been able to contact CS1 because there had been a death in Quimby's family. This call was also recorded. Quimby again called CS1 on March 27, 2013, and told CS1 that he was ready to conduct a crack cocaine purchase. CS1 stalled because agents were not in place for the buy. On March 28, 2013, CS1 contacted Quimby on TT1, stating that he/she was ready to buy the crack cocaine. Quimby told CS1 that he would call CS1 right back. Quimby called CS1 from TT1 and told CS1 to meet at the same spot at James Hill's shop where the first buy was conducted on February 27, 2013. These calls were recorded. CS1 then proceeded to James Hill's shop where CS1 purchased one ounce of crack cocaine from A. Freeman for $800. CS1 was subsequently arrested on April 23, 2013, for an unrelated charge.

All narcotics and firearms purchased by CS1 and CS2 during the controlled buys were turned over to law enforcement. CS1 and CS2 were debriefed, at which time both sources gave self-incriminating statements. The information CS1 and CS2 provided law enforcement was corroborated by audio and video recordings, physical and electronic surveillance, telephone toll analysis, and database checks. Furthermore, CS1 had been communicating via text message with Quimby on TT1. The Government asserts that the texts corroborate the prices and quantity of drugs involved in the

February 27 and March 28, 2013 controlled buys. Additionally, toll analysis shows an extensive call history between TT1 and many of Quimby's known associates.

Based on these facts, the Government contended that interception of the TT1 was necessary in order to accomplish the goals of the investigation, which were outlined as discovering: (a) the complicity of all persons involved in the conspiracy described in the affidavit; (b) the locations and amounts of cocaine, crack cocaine, being dealt by Tiant Quimby and others known and unknown in his organization; (c) the sources and distribution network of the cocaine involved in this investigation; (d) details concerning the financing to the narcotics being distributed; (e) the organization's hierarchy, including the identification of supervisors, managers, runners, and customers; and (f) the location and amount of funds derived from the illegal sale of narcotics by Tiant Quimby, and others known and unknown. Agent Jordan explained in the affidavit why traditional methods of investigation were insufficient and asserted that the Government would conduct the wiretap as to minimize the interception of communication on TT1.

### 2. June 5, 2013 Wiretap Order

On June 5 2013, upon an application and a 74-page affidavit submitted by Agent Jordan, the Honorable Marc Treadwell, United States District Judge, signed an order authorizing the extension of the interception of wire communications over TT1. In addition to including information provided in his original affidavit, Agent Jordan

included new information learned during the May wiretap, which encompassed coded conversations regarding the sale and distribution of cocaine and marijuana. He further identified two unidentified males UM1 and UM2 and asserted that there were many of Quimby's organization and sources that had not yet been identified. Again, Agent Jordan explained why traditional methods of investigation were insufficient and explained that the Government would conduct the wiretap as to minimize the interception of communication on TTI. Accordingly, the Court found that there was probable cause to issue an order continuing the wiretap.

## B. Facts Relating to Search Warrant

On June 19, 2013, Task Force Officer (TFO) Tremell Harvey (Harvey) went before a DeKalb County judge to obtain a search warrant in order to search Defendant's residence and curtilage at 2740 Tucker Valley Road, Tucker, DeKalb County, Georgia. At the time of the search warrant, Harvey was a member of the DEA Atlanta Field Division, Strike Force Group, and was also employed as a Detective with the DeKalb County Police Department.

In Harvey's request for the search warrant, he relied on the same information outlined above that was  used to seek the wiretaps on TTI, which was believed to be used by Quimby to facilitate a drug trafficking organization run by him. Harvey also relied on information used through the wiretap orders, where law enforcement learned

that Defendant was involved in the suspected drug trafficking organization, as outlined below.

Harvey stated that as a result of the wiretaps, agents intercepted communications that indicated Defendant was one of Quimby's sources of marijuana and cocaine. Beginning on May 7, 2013, communications between Defendant and Quimby were intercepted where the two individuals were discussing significant amounts of marijuana (multiple pounds at a time) that Quimby had purchased from Defendant. Along with these communications, Quimby would allegedly travel to Defendant's location on Tucker Valley Road and pick up significant amounts of marijuana from Defendant. Quimby would transport it to his residence in Covington, Georgia, and then travel to Athens, Georgia, in order to distribute the marijuana to various dealers for re-sale. Near the end of May, intercepted communications indicated that Quimby's other source of cocaine, Cequel Knolton (Knolton), became concerned that surveillance had been set up at Knolton's stash house. The concern increased when Knolton was shortly thereafter robbed. Furthermore, intercepted communications indicated that Knolton would provide Defendant with the cocaine intended for Quimby, and Quimby would travel to Defendant's residence to receive the cocaine and marijuana already being supplied by Defendant to Quimby.

On June 4, 2013, Quimby arranged for the purchase of marijuana from Defendant, and surveillance observed Quimby arriving at Defendant's residence where

Quimby remained for approximately one hour. According to intercepted communications, Quimby traveled back to Covington, Georgia, and then traveled to Athens, Georgia, where he distributed the marijuana.

On June 7, 2013, intercepted communications indicated that Defendant made contact with Quimby and requested Quimby's assistance in converting powder cocaine into crack cocaine. Defendant requested Quimby to come to his residence to meet him and assist him in processing a significant quantity of powder cocaine into cocaine base after obtaining a significant amount of "cut." Intercepted communications indicated that Knolton had been giving Defendant larger amounts of cocaine for re-distribution to others besides Quimby.

Surveillance was placed on Quimby on June 7 as he left Athens, Georgia and drove to Defendant's residence in DeKalb County. Quimby was observed leaving Defendant's house some time later with a white shopping bag. Quimby then traveled to Athens, Georgia, where he was seen putting the bag into the trunk of his vehicle. Shortly thereafter, Quimby travelled back to his residence in Covington, Georgia.

On June 8, 2013, Quimby used TT1 to contact Defendant, and they discussed the quality of the marijuana Quimby had received from Defendant at his residence on June 7, 2013. On June 9, 2013, Quimby used TT1 to contact his primary cocaine source, and the individuals discussed the cocaine that Quimby received from Defendant's residence

and a small amount of cocaine that remained at the residence. Both of these calls were intercepted.

Prior surveillance of Defendant's residence revealed two vehicles regularly parked at the address. One was a 2007 silver Toyota Camry registered to Danita Fleming (Fleming). The other vehicle was a 2012 Nissan Altima registered to Fleming and Defendant according to NCIC/GCIC checks. Fleming is believed by the Government to be an associate or girlfriend of Defendant.

On June 19, 2013, law enforcement executed a search warrant at the above mentioned location. The search warrant authorized law enforcement to search for and seize the following items at the 2740 Tucker Valley Road (Defendant's residence):

> "Cocaine, cocaine base, marijuana, cash proceeds, records of illegal drug sales (both written and electronic), cellular telephones used in the facilitation of distributing narcotics, cutting/mixing agents associated with the distribution of cocaine and the processing of cocaine into cocaine base (including but not limited to Inisotol, Fluff, Return, baking soda, etc.), containers and paraphernalia used in the mixing of cutting agents and powder cocaine and in the processing of cocaine into cocaine base (including but not limited to Pyrex, pots, bowls, utensils, etc.) hand and electronic digital scales, packaging materials (including plastic bags, sandwich bags, vacuum bags, jewelry bags, etc…), and firearms being used for illegal purposes."

During the execution of the search, there were no vehicles or occupants at the residence. During the search, agents discovered the following evidence in the kitchen: (1) a heat sealer in plain view on the kitchen counter; (2) a box of clear plastic bag partially filled with a significant amount of powder cocaine (approximately two ounces); (3) a small amount of currency; (4) two digital scales; (5) a box of vacuum sealable bags, (6) a

partially filled bottle of Inositol; and (7) a lease application for the residence in the name of Defendant; and a vehicle registration for the Nissan Altima known to be regularly operated by Defendant. Cocaine was discovered as a result of a narcotics-trained canine alerting to the odor of a controlled substance on the seam of the kitchen cabinet. In the master bedroom of the residence, agents discovered, among other things, (1) additional paper documents in Fleming's name; (2) two cell phones; and (3) a Taurus .348 caliber revolver that was reported stolen from DeKalb County. The cocaine was field tested at the scene and tested positive for cocaine. Crime laboratory confirmed the substance was cocaine with a net weight of 55.36 grams.

## DISCUSSION

### A. Motion to Suppress Intercepted Communications based on Wiretaps

Defendant seeks to suppress all evidence obtained as a result of the wiretaps, arguing that the affidavits in support of the wiretap applications failed to establish probable cause or to meet the necessity requirement and that the agents failed to minimize the intrusion on the target telephones. He requests an evidentiary hearing for the wiretaps. The Court will address each of Defendant's arguments in turn.

#### 1. Sufficiency of the Wiretap

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 [Title III] sets forth various requirements the government must meet before electronic surveillance (wiretaps) may be authorized. For example, under 18 U.S.C. §

2518, a wiretap application must include: (1) "a full and complete statement of the facts and circumstances relied upon by the applicant ... including details as to the particular offense…," (2) "a particular description of ... the type of communications sought to be intercepted," (3) "the identity of the person ... whose communications are to be intercepted," (4) "and a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[2]

### a. Probable Cause and Staleness

Moreover, the application for a wiretap must be supported by probable cause, which is the same probable cause necessary for a search warrant.[3] The court must "make a practical, common sense decision about whether the totality of the circumstances indicate that there is probable cause that the sought-for evidence will be obtained."[4] Moreover, "the Government does not have a duty to establish probable cause as to the interception of calls involving each possible interceptee named in an application for a wiretap order; the Government need only establish that there was probable cause that the telephone in question is being used in an illegal operation."[5]

---

[2] *United States v. Gonzalez Perez*, 283 Fed. App'x. 716, 720 (11th Cir. 2008) (quoting 18 U.S.C. § 2518(1)(b),(c)) (internal marks omitted) (alterations in original). The last requirement is referred to as the "necessity" requirement and will be addressed in section d below.

[3] *United States v. Grant*, 521 Fed. App'x. 841, 845 (11th Cir. 2013).

[4] *Id*. (quoting *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990)).

[5] *United States v. Domme*, 753 F.2d 950, 954 (11th Cir. 1985).

Probable cause for a wiretap must exist at the time the surveillance is authorized.[6] Warrant applications based on stale information fail to create probable cause that improper conduct is continuing.[7] "Nevertheless, when criminal activity is 'protracted and continuous,' it is more likely that passage of time will not dissipate probable cause; it is reasonable to assume that the activity has continued beyond last dates mentioned and may still be continuing."[8] Moreover, "[t]ime becomes less significant in the wiretap context, because the evidence sought to be seized is not a tangible object easily destroyed or removed," so "the stale information issue should be construed less rigorously."[9] "[E]ven stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material."[10] "[A] wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained," and the court need merely determine whether the judge who signed the warrant had a substantial basis for concluding that probable cause existed.[11]

Defendant contends that not only was there not sufficient probable cause for the orders, but it was stale. Defendant argues that there were only two completed transactions of narcotics in the affidavit, not six, and those two were between CS1 and

---

[6] *Id.* at 953.

[7] *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994).

[8] *Grant*, 521 Fed. App'x. at 845 (quoting *Domme*, 753 F.2d at 953).

[9] *Id.*

[10] *Id.* (quoting *Harris*, 20 F.3d at 450).

[11] *United States v. Degaule*, 797 F. Supp. 2d 1332, 1346 (N.D. Ga. 2011) (citation omitted).

14

Grant, none involved Quimby. However, contrary to Defendant's contention, the affidavits, as outlined above, alleged sufficient facts to establish "some degree of reliability, buttressing a finding of probable cause."[12]   As asserted in the affidavits, confidential sources had made controlled crack cocaine, marijuana, and firearm purchases on multiple occasions, and the buys were recorded via audio and video. Additionally, CS1 and Quimby had numerous discussions negotiating drug deals on TTI, and Quimby was facilitating drug sales using TTI, which was corroborated through various avenues.

Moreover, Defendant's assertion that the information was stale falls flat. Defendant argues that nearly a month passed between Quimby's last call to Freeman ("Poppa") on April 23, 2013, and the application for the wiretap on March 6, 2013. However, Courts have found that the passage of time is only one "factor to consider along with the length of criminal activity,"[13] and in cases like here, where there is alleged protracted criminal activity seeking a wiretap, "the standard for staleness is

---

[12] *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978).

[13] *Degaule*, 797 F. Supp. 2d at 1357 (citation omitted); *see also See United States v. Johnson*, 290 Fed. App'x. 214, 223 (11th Cir. 2008) (noting various Eleventh Circuit cases that rejected staleness challenges involving information that was anywhere from six months to two years old); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (finding an 18-month delay between informants' statements and the wiretap application did not render information stale); *United States v. Word,* 806 F.2d 658, 662 (6th Cir. 1986) (four to five month old information in affidavit not stale where, "the events alleged in the affidavit were of a continuing nature").

relaxed."[14]  Moreover, it is clear that Quimby was using TTI for continued transactions, because on March 28, 2013, CS1 engaged in a purchase of drugs with Freeman after calling Quimby and arranging a place to meet using TTI.

Indeed, even if the information was stale, the Government corroborated that TTI was being used to facilitate drug sales. Therefore, it was reasonable for the issuing court to assume that TTI was being used, and likely would continue to be used, to commit a criminal offense, mainly drug trafficking.[15]  However, given the nature of the charges, and that they involved ongoing criminal activity, the Court finds that there is a reasonable basis to conclude that probable cause existed when the initial wiretap was authorized, as well as the continuing wiretaps authorized in this case.

### b. Identity of Persons and Description of Communication to be Intercepted

Defendant also asserts that the wiretaps were facially insufficient because they failed to specify the persons whose communications may be intercepted in accordance with 18 U.S.C. § 2518(4). The Court is unconvinced. Section 2518(4)(a) requires that an order specify "the identity of the person, if known, whose communications are to be

---

[14] *United States v. Royster*, No. 5:07-CR-16 (WDO), 2007 WL 4336321, at *15 (M.D. Ga. Dec. 7, 2007) (citing *Domme*, 753 F. 2d at 953).

[15] *See United States v. Harrington*, 204 Fed. App'x. 784, 787 (11th Cir. 2006) ("Even assuming that an affidavit is stale, 'such information is not fatal where the government's affidavit updates, substantiates, or corroborates the stale material.") (quoting *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000)).

intercepted."[16] However, "when there is probable cause to believe that a particular telephone is being used to commit an offense, but no particular person is identifiable, a wire interception order may nevertheless properly issue under the statute."[17] Therefore, "it necessarily follows that Congress could not have intended that the authority to intercept must be limited to those conversations between a party named in the order and others, since at least in some cases, the order might not name any specific party at all."[18] In both orders, specific individuals are listed as "Target Subjects," as well as "others yet unknown." Defendant falls into the category of "others yet unknown" at the time the wiretap orders were issued, and, therefore, the orders comply with the statutory requirement.

In the same vein as his previous argument, Defendant makes a cursory assertion that the orders are insufficient because they fail to provide a sufficiently particular description of the type of communication sought to be intercepted as required by 18 U.S.C. §§ 2518 (1)(b)(iii) and (4)(c). Under § 2518 (1)(b)(iii), "[e]ach application shall include the following information," "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including…(iii) a particular description of the type of communications sought to

---

[16] 18 U.S.C. § 2518(4)(a).
[17] *United States v. Kahn,* 415 U.S. 143, 152–53 (1974).
[18] *Id.*

17

be intercepted."[19] And under § 2518 (4)(c), "each order... shall specify— (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates."[20] Defendant's contention is simply unfounded; both the application and the orders on both wiretaps specifically state seven (7) types of communications sought to be intercepted, and both orders included a statement pertaining to the offenses to which communications related.

### c. Signature

Next, Defendant argues that the applications and orders failed to state the identity of the person who authorized the application as required by 18 U.S.C §§§ 2516(1), 2518(1)(a), and 4(d).[21] Wiretap evidence may be suppressed if, among other things, it was unlawfully intercepted, or the court approval order was insufficient on its face.[22] The Supreme Court has clarified, however, that facial insufficiency—in a wiretap application or approval order—that amounts to a mere technical defect need not result in suppression.[23] Rather, suppression is required only if the statutory requirement that

---

[19] 18 U.S.C. § 2518 (1)(b)(iii).

[20] 18 U.S.C. § 2518 (4)(c).

[21] Under § 2516(1) the Attorney General may authorize an Assistant Attorney General, acting Assistant Attorney General, Deputy Assistant Attorney General, or acting Assistant Deputy Attorney General, among others, to authorize a wiretap application to be made to a federal judge. 18 U.S.C. § 2516(1). Under § 2518(1)(a), the wiretap application should include the identity of the officer authorizing the application, and under § 2518(4)(d) the order must specify the person authorizing the application. 18 U.S.C. §§ 2518(1)(a), (4)(d).

[22] *See* 18 U.S.C. § 2518(10)(a)(i)-(ii).

[23] *See United States v. Chavez,* 416 U.S. 562, 579-80 (1974); *United States v. Giordano,* 416 U.S. 505, 527 (1974).

was violated occupies a central, functional role in guarding against unwarranted use of wiretapping.[24]

Here Defendant argues that because the May 6 and June 5, 2013 orders only stated that the applications were authorized "by a duly designated official," but failed to identify the "name of the person authorizing the application," they are facially deficient and must be suppressed. He claims the same is true of the applications, as they used the same "boilerplate" language, even though they incorporated the memoranda authorizing the wiretap application. He asserts that the memoranda are also insufficient to meet the statutory requirement because the memoranda spoke of Mythili Raman's authority, but "Paul O'Brien," the Deputy Assistant Attorney, was the one that actually placed his stamp on the signature line.

The Government contends Attorney General Eric Holder's Order Number 3055-2009, authorizes the Assistant Attorney General, Acting Assistant Attorney General, any Deputy Assistant Attorney General, and any Acting Deputy Assistant Attorney General of the Criminal Division, among others, to authorize a wiretap application. Section A of the May and June applications specifically reference Order 3055-2009 and the memoranda authorizing each wiretap application. The Government acknowledges that both memoranda are from Mythili Raman, the Acting Assistant Attorney General of the Criminal Division at the time, but the memoranda authorizing the wiretap

---

[24] *Chavez*, 416 U.S. at 574-80; *Giordano*, 416 U.S. at 527-28.

applications were signed by Paul O'Brien, the Deputy Assistant Attorney General of the Criminal Division at the time of the applications. However, Raman and O'Brien are duly designated individuals under 3055-2009, who have the authority to authorize the submission of a wiretap application to a federal court; the fact that the memoranda are listed as from Raman but signed by O'Brien is no different than any other filing in the Department of Justice where an Assistant United States Attorney files a document with the court but lists the document being filed on behalf of the United States Attorney for that particular district.

The Court agrees. Defendant's arguments that the orders are insufficient by not mentioning the specific name of the authorizing individual, or that the applications are insufficient by incorporating the memoranda by reference, and that the memoranda are facially deficient because the Deputy Assistant Attorney signed them instead of the Acting Assistant U.S. Attorney. Moreover, are unpersuasive.  Even if Defendant's contentions amounted to a type of deficiency, the Court finds these are more akin to mere technical defects, and not part of the statute's functional role to guard against unwarranted use of wiretapping. Therefore, the wiretaps do not warrant total suppression.

### d.  Necessity

Defendant further contends that the wiretaps are insufficient because they failed to show "necessity." The "necessity" requirement under Tittle III states that the

affidavit accompanying the wiretap application must give "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[25] The district court "is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in practical and commonsense fashion."[26] The necessity requirement is "designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."[27] However, this "does not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted; however, it does require the Government to show why alternative measures are inadequate for this particular investigation.... The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary."[28]  "Consequently, courts will not invalidate a wiretap order simply because defense lawyers are able to suggest post factum some investigative techniques that reasonably suggest themselves."[29] Thus, absolute necessity is not a pre-requisite before a wire interception may be ordered.[30]

---

[25] 18 U.S.C. § 2518 (1)(c).

[26] *Degaule*, 797 F. Supp. 2d at 1358 (citation omitted).

[27] *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986) (citations omitted).

[28] *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (citation omitted).

[29] *United States v. Thompson*, No. 10-CR-20410, 2011 WL 4455244, at *4 (S.D. Fla. Mar. 31, 2011) (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)) (internal quotations omitted).

[30] *See Thompson*, 2011 WL 4455244, at *4.

Defendant challenges the wiretaps and argues that the approval of the wiretap was insufficient because the affidavit did not adequately demonstrate a full and complete statement regarding the necessity of other investigative procedures and requests an evidentiary hearing on this issue. Defendant takes issue with the affidavit's assertion that pole cameras, physical surveillance, and confidential informants were unsuccessful. He additionally contests the fact that law enforcement failed to use search warrants or "trash pulls," despite knowing the addresses of the key individuals they were investigating. However, the Court is unconvinced that the Government has failed to show necessity, or that an evidentiary hearing is needed on this issue.[31]

In the affidavits supporting both the May 6th and June 6th orders, the Government asserted that a wiretap was necessary "because normal investigative procedures have been tried and have been only partially successful, or are considered to be too dangerous to attempt…."[32] It goes on to list the techniques used in the nine months preceding the application, including the following: physical surveillance, confidential sources, arrests and interviews, toll records, pen registers, text records, prior wiretap information, information from search warrants and seizures, trash

---

[31] *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) ("the court has discretion in determining the need for a hearing."). The Court notes that Defendant made no *Franks* showing. In order to merit a *Franks* hearing, Defendant would have to have made a "a substantial preliminary showing that an affiant knowingly and intentionally included a false statement with reckless disregard for its truth, and the false statement was necessary to the finding of probable cause." *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

[32] 3:13-mj-506- CAR, Doc. 2 at 57 (Under Seal); 3:13-mj-501-MTT, Doc. 2 at 41 (Under Seal).

searches, police reports, arrest records, pole cameras, mobile tracking devices, recorded jail calls, consensual recordings, and financial inquiries. The affidavits assert that "[a]lthough some co-conspirators have been identified, there is probable cause to believe that many others are involved" and that the normal investigative techniques were unlikely to reveal "the upper echelon and the ultimate source" or "the nature and extent of the entire drug conspiracy."[33]

For twenty-five pages the affiant details the various techniques that were either impracticable or insufficient. For example, physical surveillance was found ineffective due to the close nature of the community in which Quimby resided, thus outside vehicles were readily identifiable. Moreover, in the June order, the affidavit made reference to physical surveillance that was detected and caused targets to become more cautious and therefore compromised the investigation. Other examples of traditional investigatory techniques such as toll records and pen registers that were found insufficient because the calls going out and coming in were often from "pre-paid" telephones; thus, the telephone numbers were constantly changing, and the content of the calls was indistinguishable between legitimate or illegitimate purposes.

Moreover, the courts have found that the government need not exhaust all possible investigatory techniques, and even where a traditional technique is shown to

---

[33] *Id.* at 58-59; *id.* at 42-43.

be partially successful, does not render the wiretap unnecessary.[34] After review of the affidavits, here, the Court is convinced that the Government has shown the affidavits were sufficiently specific, and that the wiretaps sought and approved met the necessity requirement.

### 2. Minimization

Defendant next argues that the Government failed to comply with its duty to "minimize" under 18 U.S.C. § 2518(5). The pertinent statute provides, in part, that "[e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed...in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."[35] The statute "does not prohibit the interception of all non-pertinent conversations; rather it requires the government to conduct the wiretap so as to minimize the interception of such calls."[36] In order to determine whether the government properly minimized calls under section 2518(5), a test of "reasonableness" is applied to the facts of each case.[37] Moreover, it is not necessarily reasonable that all calls intercepted could have been listened to in their entirety, particularly in cases involving "wide-ranging conspiracy with a large number of participants, [where] even a seasoned listener would have been

---

[34] *See United States v. Allen*, 274 Fed. App'x. 811, 816 (11th Cir. 2008) (noting "the fact that the traditional methods in use were producing evidence does not alter [the court's] conclusion").
[35] 18 U.S.C. § 2518(5); *see Van Horn*, 789 F. 2d at 1501.
[36] *United States v. Bryant*, No. CR413-007, 2014 WL 317694, at *6 (S.D. Ga. Jan. 28, 2014) (citing *United States v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1974)).
[37] *Van Horn*, 789 F.2d at 1501; *see also Scott*, 436 U.S. 139-40.

hard pressed to determine with any precision the relevance of many of the calls before they were completed."[38]

In the instant Motion, Defendant maintains that the Government failed to properly minimize and, therefore, conducted a general search warranting complete suppression. The Government responds that it made reasonable efforts to minimize, as evidenced by the minimization reports to the Court. Additionally, the Government notes that the calls were coded, increasing the difficulty in determining whether a communication is pertinent or non-pertinent. Within the thirty-day period of the minimization reports given to the Court, 146 calls were minimized. In its affidavits, the Government included detailed minimization procedures along with each wiretap, which included a set of instructions that explicitly limited the intercepting agents to listen to conversations of target subjects that are criminal in nature. Thus, the Government has met its burden of reasonable minimization. Becasue the Government has shown reasonable minimization, Defendant bears the burden of showing some illegality in order to justify suppression of wiretap evidence. [39]

---

[38] *Scott*, 436 U.S. at 142.

[39] *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir. 1988) (holding that the burden of production and persuasion rest on person seeking to suppress wiretap evidence on the basis of improper minimization and that defendant was not entitled to a hearing on the issue); *United States v. Cantu*, 625 F. Supp. 656, 675 n. 36 (N.D. Fla. 1985); *but see United States v. Rizzo*, 491 F.2d 215, 217 n. 7 (2d Cir. 1974) (holding that Government has burden of proof on minimization issue); *cf. United States v. De La Fuente*, 548 F.2d 528, 534-35 (5th Cir. 1977); *see also United States v. Novaton*, 271 F.3d 968, 986-87 (11th Cir. 2001) (concluding that in order to suppress evidence obtained using a wiretap, a defendant must carry his burden of proving that (1) the affiant knowingly or recklessly made alleged misrepresentations or omissions, and (2) exclusion of

Defendant contends that the Government's "pervasive and substantial failure to minimize non-pertinent calls as a whole in this case allows the inference that the Government engaged in an essentially warrantless, general search, warranting the suppression of all intercepted calls."[40] Defendant rests his argument on the fact that the number of non-pertinent calls was much higher than the number of calls minimized. Defendant contends in the May 22, 2013 15-day report, 1341 calls were intercepted, of which 291 calls were considered "pertinent," 256 were considered "non-pertinent", and 73 calls were minimized. In the June 6, 2013 15-day report, 1152 logs were logged, of which 396 were pertinent, 256 non-pertinent, and 73 calls were minimized. This is the extent of Defendant's claim that the Government failed to minimize. However, a "blind reliance on the percentage of non-pertinent calls intercepted is not a sure guide" to the test of reasonableness.[41]

Defendant's argument that the number of calls minimized compared to the number of non-pertinent calls creates an "inference" of unreasonableness is simply insufficient for this Court to conclude that the Government did not reasonably minimize its interception of non-pertinent calls or that a hearing should be held

---

alleged misrepresentations or inclusion of alleged omissions would have been a lack of probable cause for issuance of the warrant).

[40] Def's. Motion to Suppress, Doc. 236, at 17.

[41] *Scott*, 436 U.S. at 140; *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1215 (11th Cir. 2010) ("Evidence that a small number of calls were minimized does not, by itself, indicate that the minimization procedures used by the government were unreasonable.").

regarding the minimized interception of non-pertinent calls.[42] Defendant has neither presented evidence showing that minimizations was not followed nor identified "particular conversations" that should not have been listened to in their entirety, in order that the government could explain any alleged non-minimization.[43] Defendant has merely made general assertions, but he points to no evidence that the agents monitored non-pertinent conversations. Moreover, asserting bare numbers of minimized calls is simply not sufficient proof.[44]

The Government's actions demonstrate nothing except reasonableness, the Government engaged in minimization, the Government made ongoing minimization reports to the Court, this was an ongoing complex case, and the conversations were coded.[45] However, even if Defendant could have demonstrated unreasonable minimization efforts, total suppression of the information gained from the wiretaps

---

[42] *Giacalone*, 853 F.2d at 483; *de la Fuente*, 548 F.2d at 534 (finding defendant must present some evidence on specific factual allegations to show illegality and dispel his burden). Defendant requests a hearing on the number of intercepted conversations which were "coded" and the efforts used to "decode" such conversations, how soon after termination of any conversation did minimization occur, including conversations in a foreign language, and who accomplished the minimization and whether they were an expert in foreign or code language. Def's Motion to Suppress, Doc. 236, at 7. However, after considering Defendant's failure to specify conversations that he believes should have been minimized and were not, the Court is unconvinced why a hearing is necessary on these questions where the Government has shown it was reasonable in its minimization efforts. *See Cantu*, 625 F. Supp. at 664-65, 677.

[43] *United States v. Gonzalez Perez*, 283 F. App'x. 716, 722 (11th Cir. 2008).

[44] *See supra* footnote 41.

[45] *See United States v. Cox*, 462 F.2d 1293, 1300-01 (8th Cir. 1972) ("where, as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls … does not constitute failure to minimize merely because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.")

would *not* be the appropriate remedy; only the calls that he proved should have been minimized, but were not, would be the potential subject of suppression.[46]

### 3. The Good Faith Exception

Finally, Defendant argues that there is no "good faith exception" for a warrant obtained pursuant to Title III.[47] However, the good faith exception to the exclusionary rule does apply to wiretap applications and orders according to *United States v. Malekzadeh*.[48] Accordingly, even if the affidavits are lacking in establishing necessity, the exclusionary rule should not be applied in this case. Defendant, understandably, argues that Sixth Circuit's rejection of the good faith exception in *United States v. Rice*[49] is the approach this Court should take. Unfortunately for Defendant, the Eleventh Circuit

---

[46] Absent "a flagrant violation" of the minimization requirements, total suppression of all monitored calls is highly unlikely and, generally, inappropriate. *United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995) ("Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The non-incriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.") (citation omitted*); United States v. Suggs*, 531 F. Supp. 2d 13, 24 (D.D.C. 2008) ("[t]otal suppression is not appropriate unless the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief ... and is reserved for the particularly horrendous case. . .where the government has made effectively no effort towards minimization whatsoever") (citations omitted); *United States v. Batiste*, 2007 WL 2412837, at *16 (S.D. Fla. Aug. 21, 2007) (errors in minimizing <u>particular</u> calls do not automatically warrant suppression of <u>all</u> intercepts "unless a defendant demonstrates that the entire surveillance was tainted") (emphasis added); *United States v. Suquet*, 547 F. Supp. 1034, 1042-43 (N. D. Ill, 1982) (noting that showing of a general search is a "heavy burden…extremely difficult to surmount", and that violations of an "egregious magnitude must be proven").

[47] Def's. Motion to Suppress, Doc. 236 at 20.

[48] 855 F.2d 1492, 1497 (11th Cir.1988).

[49] 478 F.3d 704 (6th Cir. 2007).

Court of Appeals establishes binding precedent on this Court.[50] Therefore, even if the wiretap orders failed to meet the statutory requirements of the Title III, suppression of evidence obtained from the orders is not warranted.

Therefore, for the foregoing reasons the Court **Denies** Defendant's request for a hearing and Motion to Suppress the Evidence and Statements Seized under the Title III Orders [Doc. 236].

## B. Search Warrant of the Residence

Defendant also asks this Court to suppress all evidence seized pursuant to the search warrant [Doc. 237]. Defendant's main argument is that because the search warrant was based on information attained from the wiretaps, which he argues were improperly issued, all information attained while executing the search warrant should be suppressed as fruits of the poisonous tree. However, the Court has found the wiretaps valid; consequently, any argument made by Defendant relating to the insufficiency of probable cause based on the impropriety of the wiretaps, fails. Defendant's remaining arguments fall into two main categories: the improper issuing of

---

[50] Our district, as well as others throughout the Circuit, have likewise held that the good faith exception applies to Title III warrants. *See Royster*, 2007 WL 4336321, at *10 & n. 5 (acknowledging decision in *Rice* but finding that *Malekzadeh* "serves as binding precedent directly on point, however, so this Court follows its holding"); *United States v. Russell*, 2008 WL 4649051, at *5 (M.D. Ala. October 20, 2008) (citing *Malekzadeh* and finding that the good faith exception applies to wiretap applications and orders); *United States v. Flores*, 2007 WL 2904109, at *7 (N.D. Ga. September 27, 2007).

the search warrant and the improper execution of the warrant. The Court analyzes those arguments in turn.

### 1. Issuing of the Search Warrant

Defendant argues that the search warrant was defective because: the affidavit was not supported by probable cause; the affidavit failed to describe the veracity and reliability of the informants; and the affidavit contained stale information at the time of the warrant; the affidavit failed to provide a nexus between the residence and the items sought to be seized in the warrant; the affidavit was unconstitutionally over-broad and non-particularized in describing the items to be seized. However, Defendant offers little to back up his general claims of impropriety.

The Fourth Amendment prohibits unreasonable searches and seizures.[51] To ensure that search warrants do not violate this prohibition, the issuing judge must determine that there is probable cause to issue the warrant.[52] The judge's duty is to make a "practical, common sense decision whether, given all the circumstances set forth in the affidavit..., there is a fair probability" that the items sought will be found at the place to be searched.[53] The judge must only find a probability of criminal activity, not a *prima facie* showing.[54] This determination is based on the "factual and practical

---

[51] *See* U.S. Const., Amend. IV.
[52] *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).
[53] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
[54] *Spinelli v. United States*, 393 U.S. 410, 419 (1969).

considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[55]

Defendant asserts, for similar reasons as in his previous Motion, that there was no probable cause for a search warrant to issue; however, the Court is unconvinced. There were multiple controlled purchases between Quimby and CS1, through the use of TT1.[56] The Government heard multiple conversations between Defendant and Quimby discussing drug activities, including the purchasing of marijuana and cocaine. Moreover, the agent attested to conversations intercepted that Knolton, Quimby, and Defendant were conspiring to distribute cocaine and marijuana, and the Defendant was Quimby's marijuana and cocaine supplier. Additionally, on June 7, 2013, Quimby drove to Defendant's residence and was observed leaving some time later with a white shopping bag. He then traveled to Athens where he was seen putting the bag into the trunk of his vehicle. The next day, on June 8, 2013, Quimby used TT1 to contact Defendant, and both discussed the quality of the marijuana Quimby had received from Defendant at his residence.[57] On June 9, 2013, Quimby used TT1 to contact his primary cocaine source, and the individuals discussed the cocaine that Quimby received from

---

[55] *Gates*, 462 U.S. at 241 (citation omitted).

[56] The Court notes that in the application for the search warrant CS1 is referred to as CS; however, the source is the same as in the wiretap applications.

[57] Defendant also argues that there was no sufficient nexus between the illegal drug activities and Defendant's house, but this assertion is not supported by the record. The affidavit provided the address that illegal narcotics activity was occurring in conjunction with dates and instances of illegal drug activity involving Defendant. This information was intercepted on TT1 as well as verified by other means, including physical and electronic surveillance.

Defendant's residence and a small amount of cocaine that remained at the residence. Therefore, the judge was warranted in finding that there was a fair probability that the items sought would be found at the place to be searched.[58]

Defendant's more protracted arguments are that the affidavit failed to allege the reliability and the veracity of CS1, and the warrant was overbroad. On both contentions, the Court is unconvinced. The agents supervised all of the controlled buys conducted between CS1 and Grant, recorded phone calls between Quimby and CS1 setting up drug buys, and directly supervised the controlled buys between CS1 and Freeman which were facilitated by Quimby using TTI. The affidavit stated that CS1 was not being compensated monetarily and did not have a personal vendetta against any of the individuals involved in the investigation. The information gained from the wiretap on TT1 confirmed the information obtained from CS1 during the controlled buys. Moreover, GPS tracking of Quimby's movements beginning in April 2013, corroborated information gained from CS1 that Quimby was involved in a drug trafficking operation and was distributing narcotics in Athens through his suppliers in the Metro Atlanta

---

[58] Defendant again asserts staleness; however, the time lag between June 8 and June 13 hardly validates an argument of staleness, especially considering, as we have already found, the ongoing nature of this investigation.

area. Therefore, looking at the totality of the circumstances, there is sufficient corroborating evidence to find CS1 credible.[59]

In regard to the over-breadth of the warrant, Defendant contends that the warrant lists numerous items described in broad, generalized terms, allowing for law enforcement to seize any "records of illegal drug sales (both written and electronic), cellular telephones...packaging materials (including plastic bags, sandwich bags, vacuum bags, jewelry bags, etc.), and firearms being used for illegal purposes." Appealing to the Fourth Amendment's Warrant Clause, which "categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized,'"[60] Defendant claims that the warrant basically allowed for a general search. Again, the Court is unconvinced and finds the warrant sufficiently particularized.

"A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized,"[61] and the Fourth Amendment should be applied with "a practical margin of flexibility."[62] Moreover, words are to be given their "common sense and realistic meaning."[63] A "description is

---

[59] *Gates*, 462 U.S. at 238; *see also United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.") (citation and quotation marks omitted).

[60] *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987).

[61] *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982).

[62] *Id.* at 1349.

[63] *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007).

valid if it is as specific as the circumstances and the nature of the activity under investigation permit."[64] The warrant allows for the seizure of "records of illegal drug sales (both written and electronic)," "cellular telephones used in the facilitation of distributing narcotics," "packaging materials (including plastic bags, sandwich bags, vacuum bags, jewelry bags, etc…),"[65]and "firearms being used for illegal purposes." These descriptions are sufficiently specific. Contrary to Defendant's contentions, the warrant does not allow for *all* electronic records to be seized, but only those *records of illegal drug sales*. And the warrant only allows for the seizure of cellphones *used in the distribution of narcotics*. Although the Court recognizes the heightened privacy interests associated with cell phones,[66] however, given the nature of this investigation, the Court does not find this description unusually broad. Likewise, given the nature of this investigation, the Court does not find "firearms used for illegal purposes" insufficiently specific.

---

[64] *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985).

[65] The Court finds the description of these items sufficiently specific. *See United States v. Moody*, 977 F.2d 1425, 1432 (11th Cir. 1992) (upholding seizure of common household items, such as address labels, envelopes, string, and paper clips, where defendant stood accused of homemade bomb making).

[66] Defendant cites the Court to *Riley v. California*; however, the Court notes that this is not a search incident to arrest, and, here, the Government did in fact "get a warrant." 134 S. Ct. 2473, 2494-95 (2014) ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life'. [...] The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.") (citations omitted).

Defendant also argues that the affidavit failed to provide specific guidelines for identifying and separating documents sought in the warrant from those outside the scope of the warrant. However, the affidavit and warrant specified that records pertaining to illegal drug sales could be seized. Therefore, by the plain terms of the warrant, the officers were only to seize records reasonably connected to illegal drug activities based upon the indicia of probable cause in the affidavit. Defendant makes no showing otherwise. Defendant further argues that there was no electronic search strategy; indeed, the Government concedes there was no such strategy. However, the Government argues, and this Court agrees, that an electronic search strategy is not necessarily required to be included in the affidavit, and failure to include an electronic search strategy in the affidavit does not render the warrant invalid.[67]

Finally, Defendant argues that there was no authorization for a large-scale removal and transportation of documents found on site. However, the Court is unconvinced as to the merit of this argument—Defendant has pointed to no evidence in the record that there was such large-scale removal warranting court supervision. Indeed, it seems that the Government seized nothing more than a few written documents.

### 2. Execution of the Search Warrant

---

[67] *See Khanani,* 502 F.3d at 1290-91.

In his final contention, Defendant argues that various items were seized outside the scope of the warrant. Specifically, he contends that the Government should not have seized Danita Fleming's Wells Fargo paperwork, "additional paper documents in the name of Fleming," and the Nissan Altima's vehicle registration in Fleming's name. Defendant argues that total suppression of *all* seized evidence is warranted.

The Government contends that seizure of all documents containing Fleming's name were valid. The seizure of Fleming's Wells Fargo records was valid because Fleming was believed to be an associate/girlfriend of Defendant.[68] Thus, it was possible that Fleming's bank records could connect the proceeds of Defendant's drug deals to Fleming's account. Additionally, the warrant affidavit stated that a NCIC/GCIC check of the Nissan Altima showed that the vehicle was registered to Fleming and Defendant, indicating that he may have used this vehicle as part of his illegal drug activities. Therefore, the Government contends that seizing the vehicle's registration was valid in order to confirm or dispel that belief. The Government further contends that Defendant's description of "additional paper documents in the name of [Danita] Fleming" does not adequately describe the paperwork to allow the Government to respond to that particular argument.

The Court finds that Defendant simply has not made a sufficient argument for the Court to rule on the suppression of the items relating to Fleming at this time.

---

[68] This contention was not made in the affidavit supporting the search warrant, although Fleming and Defendant were named as joint residents of the home.

Although total suppression may be appropriate if law enforcement exceeded any reasonable interpretation of the search warrant's provisions, "seizure of items outside the scope of a warrant will not affect admissibility of items properly seized," unless officers acted with "flagrant disregard" to the terms of the search warrant.[69] Therefore, the Court notes that even if these items were outside the scope of the warrant and improperly seized, this does not amount to a flagrant disregard of the provisions of the search warrant thus meriting total suppression. Defendant's general assertion without further support simply will not do.

Therefore, for the foregoing reasons the Court **Denies** Defendant's Motion to Suppress the Evidence Pursuant to a Search Warrant [Doc. 237].

### CONCLUSION

For the foregoing reasons, Defendant's request for an hearing and Motions to Suppress [Doc. 236 & 237] are **DENIED**.

SO ORDERED, this 12th day of May, 2015.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

---

[69] *Wuagneux*, 683 F.2d at 1354.